# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs October 18, 2011

## STATE OF TENNESSEE v. KEESHA P. WASHINGTON

**Appeal from the Circuit Court for Williamson County**
**No.  II-CR102198    Timothy L. Easter, Judge**

**No. M2011-00227-CCA-R3-CD - Filed May 9, 2012**

The Defendant, Keesha P. Washington, was found guilty by a Williamson County Circuit Court jury of aggravated arson, a Class A felony.  See T.C.A. § 39-14-302 (2010).  She was sentenced as a Range I, violent offender to eighteen years' confinement.  On appeal, the Defendant contends that the trial court committed plain error by not holding a hearing to ensure that she knowingly and voluntarily waived her right not to testify and that her sentence is excessive.  We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and JEFFREY S. BIVINS, JJ., joined.

Gregory D. Smith, Clarksville, Tennessee (on appeal), and Lynda F. Jones, Nashville, Tennessee (at trial), for the appellant, Keesha P. Washington.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Kim Helper, District Attorney General; and Mary Katharine White, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case relates to a fire at the Defendant's apartment.  At the trial, John Winborn testified that on May 30, 2006, he lived at Southwinds Apartments in Franklin, Tennessee.  When he left for work that morning, he saw smoke coming from a nearby apartment and called 9-1-1.  He saw five or six people leave the building but did not see the Defendant.

Brian Young testified that he lived at Southwinds Apartments in May 2006.  As he prepared to leave for work on May 30, 2006, he saw smoke entering his apartment from

beneath his bathroom cabinets. He and his girlfriend left the apartment through the back door because the front door was surrounded by a thick cloud of smoke. He said his bathroom and his kitchen shared a wall with the Defendant's apartment. He saw four or five other people leave the building that morning. He was not able to live in his apartment for one week while it was repaired.

Franklin Fire Captain Chris Brown testified that on May 30, 2006, he responded to a fire at the Defendant's apartment and saw large amounts of smoke coming from the apartment. He said that the apartment's front door was locked and that they had to kick down the door to enter the apartment. The firemen extinguished a burning pile of cloth or paper near a sofa before realizing that a second fire was burning in the hallway. He said that the "primary seed of the fire" was in a utility closet and that they put out the fire. Two additional fires, one near a television and another near a computer, had already extinguished themselves. He found a match in the center of the fire that burned near the television. He said that the fires had four separate points of origin and that he secured the scene while he waited for fire marshal investigators to arrive. On cross-examination, Captain Brown agreed that lighter fluid was combustible and that a rag soaked in lighter fluid could catch on fire if it were near a substantial source of heat or near a flame. He agreed the fire in the utility closet caused significant damage to the closet door.

Abby Wittenmeier testified that she managed Southwinds Apartments, where the Defendant leased an apartment. She responded to the scene after a resident called her. She said the building had sixteen apartments and was evacuated. She identified the Defendant's lease, which required the Defendant to maintain a smoke detector in her apartment and prohibited her from damaging the apartment.

On cross-examination, Ms. Wittenmeier agreed that she kept the maintenance records for the apartments. The records showed that on February 18, 2006, the Defendant notified them that her heat was not working and that her front door would not lock. The records also reflected that maintenance personnel replaced loose wall outlets in the Defendant's apartment and that the Defendant made sixteen maintenance requests in the sixteen-week period between her moving in and the fire. She agreed that the last request was on May 22 and that it involved a malfunctioning air conditioner.

Whitney Mitchell testified that she previously worked for State Farm Insurance and that she handled the Defendant's renter's insurance policy. She said that the Defendant's initial policy limit was $25,000 but that on May 22, 2006, the Defendant requested that her coverage be increased to $50,000. She said that the Defendant repeatedly asked when the increased coverage would go into effect and that she made a note of the Defendant's question. On May 30, the Defendant called Ms. Mitchell and said that she had air

conditioning problems and that her apartment complex called her while she was running errands and told her a fire occurred in her apartment. The Defendant filed an insurance claim on May 30 to recover money for the fire damage.

On cross-examination, Ms. Mitchell acknowledged that she sold insurance for State Farm and that she was not a claims representative. She denied persuading customers to increase their insurance coverage. She did not remember the Defendant's complaints about not receiving copies of her automobile, life, and renter's insurance policies after the Defendant transferred her policies from Michigan to Tennessee.

Franklin Fire Lieutenant Geoff Woodlard, an expert in fire investigation and fire origin and cause, testified that he investigated the cause of the fires at the Defendant's apartment and found separate points of origin. He said that the fires were not caused by electrical or mechanical malfunctions and that they each had separate causes. He observed a container of lighter fluid in a storage area on the Defendant's patio and a match on a burnt towel in the living room. The towel was processed and tested positive for ignitable fluid. He said the smoke alarm was not attached to its proper place outside the master bedroom but was found on the floor of a second bedroom. He said the smoke alarm was functional and contained a battery. A book of matches was found on the kitchen counter. He said that in his opinion, the fires were set intentionally.

On cross-examination, Lieutenant Woodlard agreed that he consulted with Franklin Fire Marshal Andy King in concluding that the fires were set intentionally. He acknowledged that he was not able to rule out an accidental cause for the fire that burned a cardboard box in the living room. He said he was able to rule out mechanical or electrical causes for that fire, which left accidental or intentional causes. He could not rule out intentional or accidental causes for the fire in the living room that burned the sofa. He agreed a grill and charcoal were found on the patio near the storage closet where he saw lighter fluid. He agreed that the smoke detector was not covered with soot and that it did not melt.

On redirect examination, Lieutenant Woodlard testified that the smoke detector was not exposed to the same heat as other items in the apartment because it was separated from the fires and located around a corner. He said it was not likely that the heat from the fire in the closet was hot enough to cause the towel in the living room to ignite because the temperature at floor-level would have been 300 to 400 degrees. He said a room would need to be 500 to 800 degrees to ignite a towel without a flame. On recross-examination, Lieutenant Woodlard acknowledged that lighter fluid could ignite at 230 degrees.

Courtney Rowe testified that in May 2006, she lived at Southwinds Apartments with her mother. On the morning of May 30, 2006, she smelled something burning and heard a

fire alarm and people banging on her door. She left the building while the fire department put out the fire. She said that her laundry room shared a wall with the Defendant's apartment and that her dryer was stained black from the smoke. On cross-examination, Ms. Rowe testified that she did not see smoke in her apartment but that she saw soot in her laundry room.

Christopher Baker, an expert in fire origin and cause, testified that he investigated fires for the insurance industry and that he investigated the fires at the Defendant's apartment. He was assisted by David Wright, an electrical engineer who performed fire investigations. Mr. Baker interviewed the Defendant and was told that she left her apartment on the morning of the fire, that she did not cook or use her dryer before leaving, and that she left a tea candle burning in her bedroom when she left. She also told him that she removed her smoke detector from the ceiling to test it because she had been having problems with her HV/AC system and was afraid that the system could start a fire. He said smoke detectors could be tested without removing them. He said the Defendant told him that there were not any flammable fluids in her home.

Mr. Baker testified that he spoke with the Defendant but not the fire department before he examined the Defendant's apartment. He said there were "separated and unconnected origins of fire," with three separate fires in the living room and a fourth in the hallway closet. He said that the main fire occurred in the hallway closet and that he did not find an electrical failure or activity that would have caused the fire. He said the fires in the living room were not started by radiant heat from the closet fire or by an electrical malfunction. He said that samples taken from the apartment tested positive for flammable liquids and that he found burn patterns indicating that flammable fluid was poured onto the floor. He found a tea candle in the bedroom but did not find anything burned in the bedroom. He concluded that the fires in the Defendant's apartment were intentionally set.

On cross-examination, Mr. Baker testified that the interior walls of the apartment had not been "compromised by fire." He agreed flammable fluid was not found on two of the samples he sent for testing. He said he consulted with Fire Marshal King after inspecting the Defendant's apartment and learned that the fire department removed a match from the apartment. He agreed he reviewed maintenance records from the Defendant's apartment showing that she had problems with the furnace and with "plugs" falling out. He did not examine the materials collected by the fire department. He said that his investigation was independent and that his findings were separate from those made by the fire department. He agreed lighter fluid was found in an outdoor storage area but said he did not test the fluid to see if it matched the flammable liquid found on the samples he took from the apartment.

-4-

David Wright, an expert in mechanical and electrical engineering, testified that he performed engineering and fire investigations. He said that he helped Mr. Baker investigate the fire at the Defendant's apartment and that his primary role was to examine the mechanical and electrical aspects of the apartment. He said he determined the ignition sources near each fire location and examined whether they could have started the fires. He said that within the closet where the main fire occurred, he examined the light fixture, the water heater and its wiring, and the HV/AC unit and determined that they did not cause the fire. He said that a loose and disconnected wire in one of the heating elements of the HV/AC unit would not cause a fire and that he found nothing to suggest that the fire began in the HV/AC unit. He said he examined the circuit breaker and found that three breakers were tripped as a result of flames in the closet burning the wiring in the HV/AC unit and the water heater. He said he reviewed the maintenance records for the apartment and ultimately determined that the fires were not caused by a mechanical or an electrical failure.

Doctor Thomas Alvin Eaton, an expert in engineering, testified that he was an engineer and fire investigator and that he specialized in evaluating electrical and mechanical problems that could cause a fire. He conducted an independent investigation of the fires at the Defendant's apartment and examined the building's electrical system and all of the appliances in the Defendant's apartment. He found nothing that would cause an electrical or mechanical fire. He said that a malfunction in the HV/AC unit caused a wire to melt, but that the malfunction did not cause the fire. He said that nothing was near the wire that would have burned and that there was no evidence that a fire began in the HV/AC unit. He also found an electrical short circuit in the HV/AC unit, but he attributed it to the wire's insulation being burned off during the fire, which allowed the wire to short circuit. He said the short circuit did not start the fire.

Michael Rambo, an expert in fire investigations, testified that he worked for Southern Fire Analysis in 2005 and that he supervised fire investigations. He was hired by State Farm to conduct an independent investigation of the fire at the Defendant's apartment. He said that a large fire occurred in the hallway closet and that he hired Dr. Eaton to examine the mechanical equipment in the closet. Mr. Rambo said he found nothing to indicate that the water heater or HV/AC unit caused the fire. He said that the fire appeared to have originated on the floor of the closet on the right side and that he thought it was caused by an external ignition source. He said that three small fires occurred in the living room and that nothing indicated that the apartment wiring or appliance wiring caused the fires. He said that the fires in the living room were caused by "a separate ignition introduced by someone . . . ." He said that he took samples from the hallway, the closet, and in front of the couch in the living room, that he sent the samples to AK Analytical Services for testing, and that the samples taken from the closet and from near the couch tested positive for a "mineral spirits-type distillate." He concluded the five separate fires were not connected.

On cross-examination, Mr. Rambo agreed that he inspected the apartment on June 2, 2006, and that Dr. Eaton inspected the apartment on June 5. He agreed that he knew the Defendant had been arrested for arson when he wrote his report on July 5. He also agreed a fire could exist behind a wall and be hidden from view. On redirect examination, Mr. Rambo testified that nothing indicated that an unseen fire burned within the walls of the Defendant's apartment.

Dennis Akin, an expert in forensic investigations, testified that he was a forensic scientist who specialized in examining fire debris and fire-related substances. He said that he owned and operated AK Analytical Services and that he examined samples taken from the Defendant's apartment. He said the samples taken from the closet and from near the couch tested positive for a "deodorized mineral spirits-type product," an ignitable liquid most commonly associated with charcoal lighters. He said four of the seven samples submitted to him tested positive for ignitable liquid.

Bobby Medlen testified that he worked as a claims representative for State Farm Insurance. He said that the Defendant had a renter's insurance policy with State Farm and that she increased her policy limits for personal property from $25,000 to $50,000 on May 22, 2006. The Defendant submitted an insurance claim after the fire but later withdrew the claim on July 17, 2006.

On cross-examination, Mr. Medlen agreed that the Defendant transferred her car insurance policy from Michigan to Tennessee on March 22, 2006, and then cancelled the policy on April 28, 2006. He did not know if she cancelled her policy due to cost increases.

Kevin Adams testified that he was formerly a detective with the Franklin Police Department and that he led the police investigation of the fires at the Defendant's apartment, in conjunction with the Franklin Fire Department. Samples were taken from the Defendant's apartment and sent to the Tennessee Bureau of Investigation (TBI) for testing. He said that he interviewed the Defendant twice and that she waived her Miranda rights and agreed to speak with him. During their first interview, the Defendant denied seeing a fire and told him that she did not have any involvement with the fires, that she did not know how they started, and that she heard "popping" noises coming from her furnace before she left her apartment that morning.

Mr. Adams testified that during the second interview, the Defendant told him that after she heard a popping noise in the furnace, she went into the closet and saw smoke or fire. She told him that she removed a cardboard box from the closet, shut the closet door, and put her children in the car. She also told him that she returned to the apartment to smoke a cigarette, threw the match used to light the cigarette on a towel, threw her cigarette

somewhere in the apartment, and left the apartment because she was "so mad and upset that the apartment was on fire . . . ." He said the Defendant stated that she removed the smoke alarm because it was beeping. The Defendant did not tell him that she tried to put out the fires.

On cross-examination, Mr. Adams acknowledged that several firefighters were in the Defendant's apartment when he arrived on May 30, 2006. He did not know if the fire personnel moved anything within the apartment before he arrived. He said that the Defendant did not tell him if she took medication on the day of the fire but that he would have made a note on his report if she appeared to be under the influence of anything. He agreed he had been around people who were unaware of what they were saying after taking medication. He agreed that Fire Marshal King was present during the second interview with the Defendant and that Marshal King asked most of the questions. He did not know if he asked the Defendant if she had taken any medications before they spoke and said he could not tell that the Defendant was under the influence of medication during the trial by looking at her. He did not know if he or Marshal King told the Defendant that the police found her fingerprints on a pack of matches taken from her apartment. He said he may have told the Defendant it was possible that the police would find her fingerprints on the matches. He did not know if fingerprints were found on the matches.

On redirect examination, Mr. Adams identified the TBI latent fingerprint report and agreed that no fingerprints were found on the matchbook. He agreed the Defendant was told she could leave the interviews at any time.

Franklin Fire Marshal Andy King testified that he led the investigation of the fires at the Defendant's apartment. He went to the apartment and spoke with the Defendant, who told him that she heard the furnace make a popping noise that morning and that she was the last person to leave the apartment. The Defendant told him that she had no idea how the fires started and that her children did not play with fire. He met with the Defendant for a second interview after examining the evidence from her apartment and learning that the Defendant increased her renter's insurance coverage before the fire. He said he told the Defendant at the start of the second interview, "we called you in, and it's because you set the fire." He said the Defendant initially denied starting the fires but ultimately admitted that she knew of the fire in the closet before she left the apartment and that she threw a match onto a towel in her living room and saw the towel turn black. The Defendant told him that she moved a cardboard box from the closet and that she left the apartment after becoming upset. He said the Defendant did not say that she called 9-1-1 or tried to put out the fires. He said the Defendant did not state in her first interview that she removed the smoke detector. In the second interview, she told him that she removed the smoke detector and placed it in the master bedroom.

On cross-examination, Marshal King agreed that the second interview with the Defendant was on June 7, 2006, and that he had enough evidence before conducting the second interview to convince him that the Defendant caused the fires. He agreed he did not have reports from Dr. Eaton, Mr. Rambo, Mr. Akin, or Mr. Wright before the second interview, but he said he did not need the reports because multiple unexplained fires would have been set by a person. He agreed the multiple points of origin caused him to believe that the Defendant set the fires. He agreed he did not receive the TBI results until months after the second interview. He said that the Defendant voluntarily came to the interview and that she was not under arrest. He did not know if the Defendant took any medication before the interview and did not ask her if she used medication. He agreed the Defendant's child watched television with a detective in a separate room while he spoke with the Defendant. He agreed that the Defendant asked to leave the room to see her child and that he told the Defendant he could not speak with her after that day.

On redirect examination, Marshal King testified that the independent investigations of the fires had no bearing on his investigation because the multiple independent fires were evidence that the fires were set by a person. He said he never told the Defendant that she could not leave the interview room. He said that during his investigation, he ruled out everyone except the Defendant as the cause of the fires, including her children and husband.

On recross-examination, Marshal King agreed that he asked the Defendant and her husband if their children played with fire. He said the Defendant's nine-year-old daughter came to him at the scene of the fires and told him that she heard a "pop" in the furnace. On further redirect examination, Marshal King testified that each time he spoke with the Defendant, she mentioned hearing a pop in the furnace.

Randall Nelson, an expert in microanalysis, testified that he was a forensic scientist and that he worked in the microanalysis unit of the TBI laboratory in Nashville. He examined evidence removed from the Defendant's home by the Franklin Police Department, including a towel found in the living room and two samples of carpet removed from the hallway. He said that the carpet did not contain ignitable liquid but that the towel tested positive for "dearomatized medium petroleum distillate," a component of camping fuels, charcoal starters, and paint thinner. He said it was not possible to compare a match removed from the apartment to a matchbook removed from the apartment because the match was burned.

The Defendant's thirteen-year-old daughter testified for the defense that she spoke with counselors about things that bothered her, including stress from seeing her parents fighting and her enjoyment of smelling gasoline. She said that her parents told her not to smell gasoline or lighter fluid but that she would smell it when they were not present. She

said she was nine years old when she lived at Southwinds Apartments with her father, sister, and the Defendant. She said that she smelled the lighter fluid her father used for the grill and that both she and her sister smelled and played with the lighter fluid in the living room and spilled it there. She said she played with fire at her grandmother's home and lit paper towels on fire. She said that on May 30, 2006, she went into the kitchen and saw a lighter and a roll of paper towels on the counter. She said she lit a paper towel on fire and threw it in a closet when she heard the Defendant walking toward the kitchen.

On cross-examination, she testified that her parents were going through a divorce and that their fighting was stressful. She said that the only place she spilled lighter fluid in the living room was near the television and that she used a towel from the closet to clean the spill. She said she kicked over the lighter fluid container and spilled it on the towel as she attempted to clean up the first spill. She said she left the towel on the floor, put the lighter fluid on the patio, and told her mom about the spill. She agreed she spoke with Fire Marshal King and the prosecutor. She agreed she previously said that she spilled water on an electrical outlet near the computer desk and that she saw the outlet spark and turn black. She agreed she mentioned the outlet after hearing her father and the Defendant argue about the fires at the apartment.

Doctor Venecia Tippett testified that the Defendant was her niece. She said that after her son's funeral on December 4, 2000, she saw the Defendant's daughter playing with matches in the bathroom of a neighborhood club house. She said that in January 2001, the daughter came into her bedroom and set a blouse on fire. On cross-examination, Dr. Tippett testified that she did not know that the daughter attended counseling sessions or told her counselor about only one incident of setting a paper towel on fire.

The Defendant testified that she moved to Tennessee in February 2006 and that there were delays when she attempted to transfer her State Farm insurance policies from Michigan to Tennessee. She said that her car insurance premium increased by $1000 per month and that she cancelled the policy with State Farm on April 28, 2006. She said that the State Farm agent attempted to persuade her to purchase a different type of life insurance and that she was not happy with their customer service because she did not receive her "paperwork." She said she did not ask to increase her renter's insurance coverage on May 22, 2006. She said that she called State Farm that day to request a copy of her policy and that when a copy was faxed to her, she noticed it only had $25,000 in coverage. She said she called State Farm and told them her policy was supposed to have $50,000 in coverage.

The Defendant testified that she called the maintenance department at Southwinds Apartments many times about problems with her furnace and with electrical outlets falling out of the wall. She said that she never saw her daughter play with or smell gasoline but that

she often saw her roll down the car window while she pumped gas. She said that she saw her daughter play with lighters and matches and that she punished her for doing so. She said her husband, her younger daughter, and Dr. Tippett also saw her older daughter play with fire. She said that she and her daughter argued and that her daughter "acted out" and got into trouble in school.

The Defendant testified that she spoke with Detective Adams and Marshal King and that she was intimidated by their tone and the way they looked at her. She said that she was afraid of Detective Adams and Marshal King and that she asked to see her younger daughter but was told no. She said that although she was repeatedly told that she could leave, she did not leave because the officers continued to ask questions. She said that her husband called her cell phone during the interview but that Detective Adams and Marshal King did not let her answer her phone. She said she was told by them that her fingerprints were found on the matches taken from her apartment.

The Defendant testified that she did not knowingly set fire to her apartment or her personal property. She said that on the morning of May 30, 2006, she took medicine for her back injury and prepared to take her daughters to a doctor's appointment at 9:30. She said that her daughter yelled after hearing a "big boom" in the hallway and that she told her daughter that the noise was probably the furnace "popping." She said that the smoke detector beeped and that she took it down to change the battery but found no place for a battery. She placed the smoke detector on the floor and intended to have maintenance install a new detector. She put her daughters in the car and smelled smoke when she returned to the apartment to get her computer and her bag. She opened the door to the hallway closet and saw a comforter and a box on fire. She removed the box and comforter, kicked them into the living room, and used a pillow to smother the flames. She said that she thought the fire was out and that she planned to call the apartment manager later that day to report the fire. After she extinguished the fire, she smoked a cigarette and threw down the match she used to light the cigarette. She said the match was not lit when she threw it. She did not know what caused the fire in the closet. She said that six months after the fire, she heard her daughter having a nightmare and speaking in her sleep. The Defendant heard her daughter say that she threw a lit paper towel into the closet.

On cross-examination, the Defendant agreed that she threw the match near the towel and a radio sitting in the living room. She did not know why she threw the match in her living room. She admitted she told Marshal King and Detective Adams that she saw black smoke on the towel after she threw the match on it. She said that although she did not tell Marshal King that she shook the match before tossing it on the floor or that she attempted to extinguish the burning items from the closet with a red pillow, he did not ask her if she did

so. She did not know if she told Marshal King that she had no idea why the pillow was burned.

The Defendant acknowledged that she initially told Marshal King and Detective Adams that she did not know there was a fire in her apartment until she received a telephone call from the apartment complex manager. She agreed that she knew there was a fire before she left her apartment and that she told Marshal King and Detective Adams that she left the apartment because she "got mad and lost it . . . ." She agreed that although she initially told them that she did not know what caused the fire in the closet, she said later that she assumed the fire was caused by the HV/AC unit. She agreed she told them that each time she reported a problem to her apartment complex, maintenance personnel fixed the problem. She said that although maintenance personnel inspected her HV/AC unit on May 22, 2006, they failed to repair it. She acknowledged that during the interview, Marshal King and Detective Adams repeatedly told her that she was free to leave and that they wanted to hear the truth. She said she did not leave because they told her that if she left, she could not return. She agreed that she was scared of them during the interview, but she did not dispute that she attempted to hug Marshal King at the end of the interview.

The Defendant testified that when she finished extinguishing the comforter and the box, she threw the pillow across the room. She said that although there was black smoke in the apartment when she left, the closet was not burning. She agreed she told Marshal King that the fire in the closet was the "apartment complex's problem." She did not think she needed to warn her neighbors about the fire because the fire was extinguished when she left. She agreed she did not call 9-1-1 to report the fire but said she wished she had done so. Although she testified on direct examination that her smoke detector did not have a battery in it when she took it down, she identified a photograph of the smoke detector taken shortly after the firer and agreed it had a battery installed.

On redirect examination, the Defendant testified that she did not knowingly start a fire in her apartment. She said that her actions were reckless and that she did not make good decisions that day. The Defendant was found guilty on the foregoing evidence of aggravated arson and sentenced as a Range I, violent offender to eighteen years' confinement. This appeal followed.

# I

The Defendant contends that the trial court committed plain error by not holding a hearing to ensure that she knowingly and voluntarily waived her right not to testify. The State contends that the Defendant has waived this issue by failing to raise it at the trial or in her motion for a new trial and, alternatively, that the trial court did not commit plain error

because the Defendant asks this court to create a new procedure not previously recognized by our courts.

With regard to the State's waiver argument, we note that plain error may be noticed at any time and that the failure to raise the error in a previous proceeding does not constitute a waiver. T.R.A.P. 36(b); State v. Swanson, 680 S.W.2d 487, 492 (Tenn. Crim. App. 1984) ("Appellate courts may consider plain error whether or not it is properly preserved."). Our supreme court has adopted the factors developed by this court to be considered

> when deciding whether an error constitutes "plain error" in the absence of an objection at trial: "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is necessary to do substantial justice."

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). The record must establish all five factors before plain error will be recognized and "complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." Id. at 283. In order for this court to reverse the judgment of a trial court, the error must be "of such a great magnitude that it probably changed the outcome of the [proceedings]," and "recognition should be limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." Adkisson, 899 S.W.2d at 642.

In Momon v. State, our supreme court stated that because "the right to testify at one's own trial is a fundamental right, it follows that the right may only be waived personally by the defendant." 18 S.W.3d 152, 161 (Tenn. 1999). The court stated that a hearing was required, "out of the presence of the jury, to inquire of the defendant whether the defendant has made a knowing, voluntary, and intelligent waiver of the right to testify. This hearing shall be placed on the record and shall be in the presence of the trial judge." Id. at 162. The Defendant argues that because a defendant who chooses not to testify must personally waive the right to testify during a separate hearing on the record, a similar hearing should be required to ensure that a defendant who chooses to testify knowingly and voluntarily waived the right not to testify. The Defendant essentially argues that this new type of hearing should be required because if "a person is warned about their right to remain silent before giving a police statement[,] why not before the defendant subjects themselves to cross-examination before a jury?" Because such a hearing is not required by Momon, the trial court did not

-12-

breach a clear and unequivocal rule of law by not holding a hearing to ensure that the Defendant knowingly and voluntarily chose to testify. The Defendant is not entitled to relief.

**II**

The Defendant contends that her eighteen-year sentence is excessive because the trial court applied incorrect law and mistakenly thought that the presumptive sentence was twenty years, the midpoint in the applicable range. She argues that because the trial court sentenced her below what it thought was the presumptive sentence, the trial court would have sentenced her to fifteen years had it applied the correct law. The State contends that the trial court properly sentenced the Defendant and that the record does not support an assertion that the trial court started at the midpoint in the applicable range when determining the sentence. We agree with the State.

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. T.C.A. §§ 40-35-401(d), -402(d) (2010). As the Sentencing Commission Comments to these sections note, the burden is now on the appealing party to show that the sentencing is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "'the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances.'" State v. Carter, 254 S.W.3d 335, 344-45 (Tenn. 2008) (quoting State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991)). In this respect, for the purpose of meaningful appellate review, the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994); see T.C.A. § 40-35-210(e) (2010).

Also, in conducting a de novo review, we must consider (1) any evidence received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) statistical information provided by the administrative office of the courts as to sentencing practices for similar

offenses in Tennessee, (7) any statement that the defendant made on his own behalf, and (8) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103, -210; see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229, 236 (Tenn. 1986).

In imposing a sentence within the appropriate range of punishment for the defendant:

> [T]he court shall consider, but is not bound by, the following advisory sentencing guidelines:
>
> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and
>
> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

T.C.A. § 40-35-210. From this, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Carter, 254 S.W.3d at 343 (quoting T.C.A. § 40-35-210(d)).

At the sentencing hearing, Abby Wittenmeier testified that she managed Southwinds Apartments and maintained its records. She said the apartment complex lost about $1930 in rent from the Defendant's apartment after the fires because the apartment was vacant for sixty-two days while it was repaired. Two residents had to be relocated to other apartments and one additional resident could not return to his home for four or five days. She said the apartment complex filed an insurance claim to recover the losses, which were approximately $27,000, and paid a $5000 deductible. On cross-examination, Ms. Wittenmeier testified that the apartment complex had 268 units and that six units were unoccupied at the time of the sentencing hearing. She said apartments typically remained vacant for fourteen to thirty days between tenants.

Marshal King testified that twenty-six fire department personnel and seven fire department vehicles responded to the fires at the Defendant's apartment, which cost the city of Franklin between $4000 and $5000. He said the city spent additional money to pay the personnel who investigated the fire and prepared for the trial. He said that a common motive

for setting a fire was to receive insurance money and that the Defendant told him during an interview that she filed a previous insurance claim after a fire in Michigan. He investigated the fire in Michigan and learned that it also involved a fire in the living room that occurred shortly after the Defendant left her home to run errands. He said that the fire in Michigan was determined to be accidental and that the Defendant received $25,000 from her insurance company. He said the fire in Michigan occurred on July 14, 2005, less than a year before the fires in this case.

On cross-examination, Marshal King testified that no firefighters were hurt by the fires at the Defendant's apartment and that no one was present in the apartment when they arrived. He agreed the Defendant was not charged with arson after the fire in Michigan.

Doctor Zia Wahid, a psychiatrist and an associate professor of psychiatry at Vanderbilt University, testified that the Defendant was a patient of his and that she had a history of serious mental illness. He did not know when her mental illness began, but said that a 1997 diagnosis would be consistent with how mental illness began and progressed over time. He said that he began seeing the Defendant in December 2007 and that he diagnosed her with a severe form of bipolar disorder with "psychotic features." He said the Defendant was using medication when she came to see him, including Lithium, Seroquel, and Lamictal, which were mood stabilizers. He said that the Defendant was hospitalized shortly before coming to see him and that hospital records showed she had not taken her medication for about six months before being hospitalized. He said that the Defendant was unstable when he first met her and that she told him she heard voices. He said that despite being unstable, the Defendant was somewhat coherent and cooperative and that she knew who she was, the time, the date, and why she was meeting with him. He said a person experiencing an active stage of a bipolar disorder could appear normal to people who did not know the person. He stopped treating the Defendant in April 2010.

On cross-examination, Dr. Wahid testified that the Defendant was released from a psychiatric hospitalization shortly before she first met with him in 2007. He agreed he modified the Defendant's medications after their first meeting. He said that after one year of treatment, the Defendant told him about the fires. He said that he did not discuss the facts of the case with the Defendant or review the evidence in the case, but that he urged her to cooperate at her trial. He said that during the Defendant's course of treatment, he did not contact child services to ensure the welfare of the Defendant's children and did not think that the Defendant needed to be committed to a mental health facility.

Defense counsel read a letter from the Defendant, in which the Defendant apologized for her actions and expressed remorse. The Defendant stated that she did not intend to endanger anyone and asked for mercy.

-15-

The trial court found that the following enhancement factors applied pursuant to Tennessee Code Annotated section 40-35-114: (3) the offense involved more than one victim, and (10) the Defendant had no hesitation about committing a crime when the risk to human life was high. See T.C.A. § 40-35-114 (2006). The court found mitigating factor (13) applicable because the Defendant had no previous criminal record and because the Defendant had a mental health condition. See T.C.A. § 40-35-113 (2010). The Defendant was sentenced to eighteen years' confinement as a Range I, violent offender.

The Defendant contends that her sentence is excessive because the trial court applied incorrect law and mistakenly thought the presumptive sentence was twenty years. We disagree. After the evidence was presented, the trial court noted that the applicable range was fifteen to twenty-five years. The State indicated that the "midline begin[s] at 20 years . . . Your Honor could look back to the State v. Joseph Lucas opinion and I believe they set it out in there that [the] 20 year midline did survive [the 2005 sentencing amendments]." The trial judge questioned whether the presumptive midpoint sentence for a Class A felony survived the 2005 sentencing amendments, noted that he presided over the case cited by the State, and ordered the court to take a recess. When the proceedings resumed, the State informed the trial judge that "just for the record, this offense occurred post 2005 amendments."

The record does not reflect that the trial court applied incorrect law or that it accepted the State's argument that the presumptive sentence was twenty years. Although the trial judge acknowledged that he presided over the trial in State v. Joseph S. Lucas, Jr., that opinion does not state that the presumption of a midpoint sentence for a Class A felony survived the 2005 sentencing amendments. See State v. Joseph S. Lucas, Jr., No. M2007-01411-CCA-R3-CD, Williamson County (Tenn. Crim. App. Sept. 26, 2008), perm. app. denied (Tenn. Mar. 16, 2009). Furthermore, in Joseph S. Lucas, Jr., this court stated that "[t]he record is clear that the trial court was aware of the status of the law regarding the [2005] sentencing amendment." Joseph S. Lucas, Jr., slip op. at 5. Here, the trial court did not state that the presumptive sentence was twenty years but noted that the minimum sentence it could consider was fifteen years. The court explained its consideration of enhancement and mitigating factors and stated that it believed the sentence imposed was consistent with the purposes and principles of the sentencing act. The Defendant has not shown that the trial court imposed an improper sentence or that it applied incorrect law. The Defendant is not entitled to relief.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
JOSEPH M. TIPTON,  PRESIDING JUDGE

-16-