# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### October 29, 2014 Session

## KEESHA WASHINGTON v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Williamson County**
**No. CR047261    Timothy L. Easter, Judge**

---

**No. M2014-00250-CCA-R3-PC - Filed February 27, 2015**

---

The Petitioner, Keesha Washington, appeals the Williamson County Circuit Court's denial of her petition for post-conviction relief from her 2010 conviction for aggravated arson and her eighteen-year sentence.  She contends that the post-conviction court erred by denying her relief because she received the ineffective assistance of counsel.  We affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROGER A. PAGE, JJ., joined.

Stacey Schlitz, Nashville, Tennessee, for the appellant, Keesha Washington.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Kim R. Helper, District Attorney General; and Mary Katharine White, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case arises from the Petitioner's conviction for setting fire to her apartment on May 30, 2006.  She appealed, and this court summarized the facts of the case as follows:

> At the trial, John Winborn testified that on May 30, 2006, he lived at Southwinds Apartments in Franklin, Tennessee.  When he left for work that morning, he saw smoke coming from a nearby apartment and called 9-1-1.  He saw five or six people leave the building but did not see the Defendant.

Brian Young testified that he lived at Southwinds Apartments in May 2006. As he prepared to leave for work on May 30, 2006, he saw smoke entering his apartment from beneath his bathroom cabinets. He and his girlfriend left the apartment through the back door because the front door was surrounded by a thick cloud of smoke. He said his bathroom and his kitchen shared a wall with the Defendant's apartment. He saw four or five other people leave the building that morning. He was not able to live in his apartment for one week while it was repaired.

Franklin Fire Captain Chris Brown testified that on May 30, 2006, he responded to a fire at the Defendant's apartment and saw large amounts of smoke coming from the apartment. He said that the apartment's front door was locked and that they had to kick down the door to enter the apartment. The firemen extinguished a burning pile of cloth or paper near a sofa before realizing that a second fire was burning in the hallway. He said that the "primary seed of the fire" was in a utility closet and that they put out the fire. Two additional fires, one near a television and another near a computer, had already extinguished themselves. He found a match in the center of the fire that burned near the television. He said that the fires had four separate points of origin and that he secured the scene while he waited for fire marshal investigators to arrive. On cross-examination, Captain Brown agreed that lighter fluid was combustible and that a rag soaked in lighter fluid could catch on fire if it were near a substantial source of heat or near a flame. He agreed the fire in the utility closet caused significant damage to the closet door.

Abby Wittenmeier testified that she managed Southwinds Apartments, where the Defendant leased an apartment. She responded to the scene after a resident called her. She said the building had sixteen apartments and was evacuated. She identified the Defendant's lease, which required the Defendant to maintain a smoke detector in her apartment and prohibited her from damaging the apartment.

On cross-examination, Ms. Wittenmeier agreed that she kept the maintenance records for the apartments. The records showed that on February 18, 2006, the Defendant notified them that her heat was not working and that her front door would not lock. The records also reflected that maintenance personnel replaced loose wall outlets in the Defendant's apartment and that the Defendant made sixteen maintenance requests in the sixteen-week period between her moving in and the fire. She agreed that the last request was on

May 22 and that it involved a malfunctioning air conditioner.

Whitney Mitchell testified that she previously worked for State Farm Insurance and that she handled the Defendant's renter's insurance policy. She said that the Defendant's initial policy limit was $25,000 but that on May 22, 2006, the Defendant requested that her coverage be increased to $50,000. She said that the Defendant repeatedly asked when the increased coverage would go into effect and that she made a note of the Defendant's question. On May 30, the Defendant called Ms. Mitchell and said that she had air conditioning problems and that her apartment complex called her while she was running errands and told her a fire occurred in her apartment. The Defendant filed an insurance claim on May 30 to recover money for the fire damage.

On cross-examination, Ms. Mitchell acknowledged that she sold insurance for State Farm and that she was not a claims representative. She denied persuading customers to increase their insurance coverage. She did not remember the Defendant's complaints about not receiving copies of her automobile, life, and renter's insurance policies after the Defendant transferred her policies from Michigan to Tennessee.

Franklin Fire Lieutenant Geoff Woodlard, an expert in fire investigation and fire origin and cause, testified that he investigated the cause of the fires at the Defendant's apartment and found separate points of origin. He said that the fires were not caused by electrical or mechanical malfunctions and that they each had separate causes. He observed a container of lighter fluid in a storage area on the Defendant's patio and a match on a burnt towel in the living room. The towel was processed and tested positive for ignitable fluid. He said the smoke alarm was not attached to its proper place outside the master bedroom but was found on the floor of a second bedroom. He said the smoke alarm was functional and contained a battery. A book of matches was found on the kitchen counter. He said that in his opinion, the fires were set intentionally.

On cross-examination, Lieutenant Woodlard agreed that he consulted with Franklin Fire Marshal Andy King in concluding that the fires were set intentionally. He acknowledged that he was not able to rule out an accidental cause for the fire that burned a cardboard box in the living room. He said he was able to rule out mechanical or electrical causes for that fire, which left accidental or intentional causes. He could not rule out intentional or accidental causes for the fire in the living room that burned the sofa. He agreed a grill and charcoal were found on the patio near the storage closet where he saw

lighter fluid. He agreed that the smoke detector was not covered with soot and that it did not melt.

On redirect examination, Lieutenant Woodlard testified that the smoke detector was not exposed to the same heat as other items in the apartment because it was separated from the fires and located around a corner. He said it was not likely that the heat from the fire in the closet was hot enough to cause the towel in the living room to ignite because the temperature at floor-level would have been 300 to 400 degrees. He said a room would need to be 500 to 800 degrees to ignite a towel without a flame. On recross-examination, Lieutenant Woodlard acknowledged that lighter fluid could ignite at 230 degrees.

Courtney Rowe testified that in May 2006, she lived at Southwinds Apartments with her mother. On the morning of May 30, 2006, she smelled something burning and heard a fire alarm and people banging on her door. She left the building while the fire department put out the fire. She said that her laundry room shared a wall with the Defendant's apartment and that her dryer was stained black from the smoke. On cross-examination, Ms. Rowe testified that she did not see smoke in her apartment but that she saw soot in her laundry room.

Christopher Baker, an expert in fire origin and cause, testified that he investigated fires for the insurance industry and that he investigated the fires at the Defendant's apartment. He was assisted by David Wright, an electrical engineer who performed fire investigations. Mr. Baker interviewed the Defendant and was told that she left her apartment on the morning of the fire, that she did not cook or use her dryer before leaving, and that she left a tea candle burning in her bedroom when she left. She also told him that she removed her smoke detector from the ceiling to test it because she had been having problems with her HV/AC system and was afraid that the system could start a fire. He said smoke detectors could be tested without removing them. He said the Defendant told him that there were not any flammable fluids in her home.

Mr. Baker testified that he spoke with the Defendant but not the fire department before he examined the Defendant's apartment. He said there were "separated and unconnected origins of fire," with three separate fires in the living room and a fourth in the hallway closet. He said that the main fire occurred in the hallway closet and that he did not find an electrical failure or activity that would have caused the fire. He said the fires in the living room

-4-

were not started by radiant heat from the closet fire or by an electrical malfunction. He said that samples taken from the apartment tested positive for flammable liquids and that he found burn patterns indicating that flammable fluid was poured onto the floor. He found a tea candle in the bedroom but did not find anything burned in the bedroom. He concluded that the fires in the Defendant's apartment were intentionally set.

On cross-examination, Mr. Baker testified that the interior walls of the apartment had not been "compromised by fire." He agreed flammable fluid was not found on two of the samples he sent for testing. He said he consulted with Fire Marshal King after inspecting the Defendant's apartment and learned that the fire department removed a match from the apartment. He agreed he reviewed maintenance records from the Defendant's apartment showing that she had problems with the furnace and with "plugs" falling out. He did not examine the materials collected by the fire department. He said that his investigation was independent and that his findings were separate from those made by the fire department. He agreed lighter fluid was found in an outdoor storage area but said he did not test the fluid to see if it matched the flammable liquid found on the samples he took from the apartment.

David Wright, an expert in mechanical and electrical engineering, testified that he performed engineering and fire investigations. He said that he helped Mr. Baker investigate the fire at the Defendant's apartment and that his primary role was to examine the mechanical and electrical aspects of the apartment. He said he determined the ignition sources near each fire location and examined whether they could have started the fires. He said that within the closet where the main fire occurred, he examined the light fixture, the water heater and its wiring, and the HV/AC unit and determined that they did not cause the fire. He said that a loose and disconnected wire in one of the heating elements of the HV/AC unit would not cause a fire and that he found nothing to suggest that the fire began in the HV/AC unit. He said he examined the circuit breaker and found that three breakers were tripped as a result of flames in the closet burning the wiring in the HV/AC unit and the water heater. He said he reviewed the maintenance records for the apartment and ultimately determined that the fires were not caused by a mechanical or an electrical failure.

Doctor Thomas Alvin Eaton, an expert in engineering, testified that he was an engineer and fire investigator and that he specialized in evaluating electrical and mechanical problems that could cause a fire. He conducted an independent investigation of the fires at the Defendant's apartment and

examined the building's electrical system and all of the appliances in the Defendant's apartment. He found nothing that would cause an electrical or mechanical fire. He said that a malfunction in the HV/AC unit caused a wire to melt, but that the malfunction did not cause the fire. He said that nothing was near the wire that would have burned and that there was no evidence that a fire began in the HV/AC unit. He also found an electrical short circuit in the HV/AC unit, but he attributed it to the wire's insulation being burned off during the fire, which allowed the wire to short circuit. He said the short circuit did not start the fire.

Michael Rambo, an expert in fire investigations, testified that he worked for Southern Fire Analysis in 2005 and that he supervised fire investigations. He was hired by State Farm to conduct an independent investigation of the fire at the Defendant's apartment. He said that a large fire occurred in the hallway closet and that he hired Dr. Eaton to examine the mechanical equipment in the closet. Mr. Rambo said he found nothing to indicate that the water heater or HV/AC unit caused the fire. He said that the fire appeared to have originated on the floor of the closet on the right side and that he thought it was caused by an external ignition source. He said that three small fires occurred in the living room and that nothing indicated that the apartment wiring or appliance wiring caused the fires. He said that the fires in the living room were caused by "a separate ignition introduced by someone . . . ." He said that he took samples from the hallway, the closet, and in front of the couch in the living room, that he sent the samples to AK Analytical Services for testing, and that the samples taken from the closet and from near the couch tested positive for a "mineral spirits-type distillate." He concluded the five separate fires were not connected.

On cross-examination, Mr. Rambo agreed that he inspected the apartment on June 2, 2006, and that Dr. Eaton inspected the apartment on June 5. He agreed that he knew the Defendant had been arrested for arson when he wrote his report on July 5. He also agreed a fire could exist behind a wall and be hidden from view. On redirect examination, Mr. Rambo testified that nothing indicated that an unseen fire burned within the walls of the Defendant's apartment.

Dennis Akin, an expert in forensic investigations, testified that he was a forensic scientist who specialized in examining fire debris and fire-related substances. He said that he owned and operated AK Analytical Services and that he examined samples taken from the Defendant's apartment. He said the

samples taken from the closet and from near the couch tested positive for a "deodorized mineral spirits-type product," an ignitable liquid most commonly associated with charcoal lighters. He said four of the seven samples submitted to him tested positive for ignitable liquid.

Bobby Medlen testified that he worked as a claims representative for State Farm Insurance. He said that the Defendant had a renter's insurance policy with State Farm and that she increased her policy limits for personal property from $25,000 to $50,000 on May 22, 2006. The Defendant submitted an insurance claim after the fire but later withdrew the claim on July 17, 2006.

On cross-examination, Mr. Medlen agreed that the Defendant transferred her car insurance policy from Michigan to Tennessee on March 22, 2006, and then cancelled the policy on April 28, 2006. He did not know if she cancelled her policy due to cost increases.

Kevin Adams testified that he was formerly a detective with the Franklin Police Department and that he led the police investigation of the fires at the Defendant's apartment, in conjunction with the Franklin Fire Department. Samples were taken from the Defendant's apartment and sent to the Tennessee Bureau of Investigation (TBI) for testing. He said that he interviewed the Defendant twice and that she waived her Miranda rights and agreed to speak with him. During their first interview, the Defendant denied seeing a fire and told him that she did not have any involvement with the fires, that she did not know how they started, and that she heard "popping" noises coming from her furnace before she left her apartment that morning.

Mr. Adams testified that during the second interview, the Defendant told him that after she heard a popping noise in the furnace, she went into the closet and saw smoke or fire. She told him that she removed a cardboard box from the closet, shut the closet door, and put her children in the car. She also told him that she returned to the apartment to smoke a cigarette, threw the match used to light the cigarette on a towel, threw her cigarette somewhere in the apartment, and left the apartment because she was "so mad and upset that the apartment was on fire . . . ." He said the Defendant stated that she removed the smoke alarm because it was beeping. The Defendant did not tell him that she tried to put out the fires.

On cross-examination, Mr. Adams acknowledged that several firefighters were in the Defendant's apartment when he arrived on May 30,

2006. He did not know if the fire personnel moved anything within the apartment before he arrived. He said that the Defendant did not tell him if she took medication on the day of the fire but that he would have made a note on his report if she appeared to be under the influence of anything. He agreed he had been around people who were unaware of what they were saying after taking medication. He agreed that Fire Marshal King was present during the second interview with the Defendant and that Marshal King asked most of the questions. He did not know if he asked the Defendant if she had taken any medications before they spoke and said he could not tell that the Defendant was under the influence of medication during the trial by looking at her. He did not know if he or Marshal King told the Defendant that the police found her fingerprints on a pack of matches taken from her apartment. He said he may have told the Defendant it was possible that the police would find her fingerprints on the matches. He did not know if fingerprints were found on the matches.

On redirect examination, Mr. Adams identified the TBI latent fingerprint report and agreed that no fingerprints were found on the matchbook. He agreed the Defendant was told she could leave the interviews at any time.

Franklin Fire Marshal Andy King testified that he led the investigation of the fires at the Defendant's apartment. He went to the apartment and spoke with the Defendant, who told him that she heard the furnace make a popping noise that morning and that she was the last person to leave the apartment. The Defendant told him that she had no idea how the fires started and that her children did not play with fire. He met with the Defendant for a second interview after examining the evidence from her apartment and learning that the Defendant increased her renter's insurance coverage before the fire. He said he told the Defendant at the start of the second interview, "we called you in, and it's because you set the fire." He said the Defendant initially denied starting the fires but ultimately admitted that she knew of the fire in the closet before she left the apartment and that she threw a match onto a towel in her living room and saw the towel turn black. The Defendant told him that she moved a cardboard box from the closet and that she left the apartment after becoming upset. He said the Defendant did not say that she called 9-1-1 or tried to put out the fires. He said the Defendant did not state in her first interview that she removed the smoke detector. In the second interview, she told him that she removed the smoke detector and placed it in the master bedroom.

On cross-examination, Marshal King agreed that the second interview with the Defendant was on June 7, 2006, and that he had enough evidence before conducting the second interview to convince him that the Defendant caused the fires. He agreed he did not have reports from Dr. Eaton, Mr. Rambo, Mr. Akin, or Mr. Wright before the second interview, but he said he did not need the reports because multiple unexplained fires would have been set by a person. He agreed the multiple points of origin caused him to believe that the Defendant set the fires. He agreed he did not receive the TBI results until months after the second interview. He said that the Defendant voluntarily came to the interview and that she was not under arrest. He did not know if the Defendant took any medication before the interview and did not ask her if she used medication. He agreed the Defendant's child watched television with a detective in a separate room while he spoke with the Defendant. He agreed that the Defendant asked to leave the room to see her child and that he told the Defendant he could not speak with her after that day.

On redirect examination, Marshal King testified that the independent investigations of the fires had no bearing on his investigation because the multiple independent fires were evidence that the fires were set by a person. He said he never told the Defendant that she could not leave the interview room. He said that during his investigation, he ruled out everyone except the Defendant as the cause of the fires, including her children and husband.

On recross-examination, Marshal King agreed that he asked the Defendant and her husband if their children played with fire. He said the Defendant's nine-year-old daughter came to him at the scene of the fires and told him that she heard a "pop" in the furnace. On further redirect examination, Marshal King testified that each time he spoke with the Defendant, she mentioned hearing a pop in the furnace.

Randall Nelson, an expert in microanalysis, testified that he was a forensic scientist and that he worked in the microanalysis unit of the TBI laboratory in Nashville. He examined evidence removed from the Defendant's home by the Franklin Police Department, including a towel found in the living room and two samples of carpet removed from the hallway. He said that the carpet did not contain ignitable liquid but that the towel tested positive for "dearomatized medium petroleum distillate," a component of camping fuels, charcoal starters, and paint thinner. He said it was not possible to compare a match removed from the apartment to a matchbook removed from the

apartment because the match was burned.

The Defendant's thirteen-year-old daughter testified for the defense that she spoke with counselors about things that bothered her, including stress from seeing her parents fighting and her enjoyment of smelling gasoline. She said that her parents told her not to smell gasoline or lighter fluid but that she would smell it when they were not present. She said she was nine years old when she lived at Southwinds Apartments with her father, sister, and the Defendant. She said that she smelled the lighter fluid her father used for the grill and that both she and her sister smelled and played with the lighter fluid in the living room and spilled it there. She said she played with fire at her grandmother's home and lit paper towels on fire. She said that on May 30, 2006, she went into the kitchen and saw a lighter and a roll of paper towels on the counter. She said she lit a paper towel on fire and threw it in a closet when she heard the Defendant walking toward the kitchen.

On cross-examination, she testified that her parents were going through a divorce and that their fighting was stressful. She said that the only place she spilled lighter fluid in the living room was near the television and that she used a towel from the closet to clean the spill. She said she kicked over the lighter fluid container and spilled it on the towel as she attempted to clean up the first spill. She said she left the towel on the floor, put the lighter fluid on the patio, and told her mom about the spill. She agreed she spoke with Fire Marshal King and the prosecutor. She agreed she previously said that she spilled water on an electrical outlet near the computer desk and that she saw the outlet spark and turn black. She agreed she mentioned the outlet after hearing her father and the Defendant argue about the fires at the apartment.

Doctor Venecia Tippett testified that the Defendant was her niece. She said that after her son's funeral on December 4, 2000, she saw the Defendant's daughter playing with matches in the bathroom of a neighborhood club house. She said that in January 2001, the daughter came into her bedroom and set a blouse on fire. On cross-examination, Dr. Tippett testified that she did not know that the daughter attended counseling sessions or told her counselor about only one incident of setting a paper towel on fire.

The Defendant testified that she moved to Tennessee in February 2006 and that there were delays when she attempted to transfer her State Farm insurance policies from Michigan to Tennessee. She said that her car insurance premium increased by $1000 per month and that she cancelled the

policy with State Farm on April 28, 2006. She said that the State Farm agent attempted to persuade her to purchase a different type of life insurance and that she was not happy with their customer service because she did not receive her "paperwork." She said she did not ask to increase her renter's insurance coverage on May 22, 2006. She said that she called State Farm that day to request a copy of her policy and that when a copy was faxed to her, she noticed it only had $25,000 in coverage. She said she called State Farm and told them her policy was supposed to have $50,000 in coverage.

The Defendant testified that she called the maintenance department at Southwinds Apartments many times about problems with her furnace and with electrical outlets falling out of the wall. She said that she never saw her daughter play with or smell gasoline but that she often saw her roll down the car window while she pumped gas. She said that she saw her daughter play with lighters and matches and that she punished her for doing so. She said her husband, her younger daughter, and Dr. Tippett also saw her older daughter play with fire. She said that she and her daughter argued and that her daughter "acted out" and got into trouble in school.

The Defendant testified that she spoke with Detective Adams and Marshal King and that she was intimidated by their tone and the way they looked at her. She said that she was afraid of Detective Adams and Marshal King and that she asked to see her younger daughter but was told no. She said that although she was repeatedly told that she could leave, she did not leave because the officers continued to ask questions. She said that her husband called her cell phone during the interview but that Detective Adams and Marshal King did not let her answer her phone. She said she was told by them that her fingerprints were found on the matches taken from her apartment.

The Defendant testified that she did not knowingly set fire to her apartment or her personal property. She said that on the morning of May 30, 2006, she took medicine for her back injury and prepared to take her daughters to a doctor's appointment at 9:30. She said that her daughter yelled after hearing a "big boom" in the hallway and that she told her daughter that the noise was probably the furnace "popping." She said that the smoke detector beeped and that she took it down to change the battery but found no place for a battery. She placed the smoke detector on the floor and intended to have maintenance install a new detector. She put her daughters in the car and smelled smoke when she returned to the apartment to get her computer and her bag. She opened the door to the hallway closet and saw a comforter and a box

-11-

on fire. She removed the box and comforter, kicked them into the living room, and used a pillow to smother the flames. She said that she thought the fire was out and that she planned to call the apartment manager later that day to report the fire. After she extinguished the fire, she smoked a cigarette and threw down the match she used to light the cigarette. She said the match was not lit when she threw it. She did not know what caused the fire in the closet. She said that six months after the fire, she heard her daughter having a nightmare and speaking in her sleep. The Defendant heard her daughter say that she threw a lit paper towel into the closet.

On cross-examination, the Defendant agreed that she threw the match near the towel and a radio sitting in the living room. She did not know why she threw the match in her living room. She admitted she told Marshal King and Detective Adams that she saw black smoke on the towel after she threw the match on it. She said that although she did not tell Marshal King that she shook the match before tossing it on the floor or that she attempted to extinguish the burning items from the closet with a red pillow, he did not ask her if she did so. She did not know if she told Marshal King that she had no idea why the pillow was burned.

The Defendant acknowledged that she initially told Marshal King and Detective Adams that she did not know there was a fire in her apartment until she received a telephone call from the apartment complex manager. She agreed that she knew there was a fire before she left her apartment and that she told Marshal King and Detective Adams that she left the apartment because she "got mad and lost it . . . ." She agreed that although she initially told them that she did not know what caused the fire in the closet, she said later that she assumed the fire was caused by the HV/AC unit. She agreed she told them that each time she reported a problem to her apartment complex, maintenance personnel fixed the problem. She said that although maintenance personnel inspected her HV/AC unit on May 22, 2006, they failed to repair it. She acknowledged that during the interview, Marshal King and Detective Adams repeatedly told her that she was free to leave and that they wanted to hear the truth. She said she did not leave because they told her that if she left, she could not return. She agreed that she was scared of them during the interview, but she did not dispute that she attempted to hug Marshal King at the end of the interview.

The Defendant testified that when she finished extinguishing the comforter and the box, she threw the pillow across the room. She said that

-12-

although there was black smoke in the apartment when she left, the closet was not burning. She agreed she told Marshal King that the fire in the closet was the "apartment complex's problem." She did not think she needed to warn her neighbors about the fire because the fire was extinguished when she left. She agreed she did not call 9-1-1 to report the fire but said she wished she had done so. Although she testified on direct examination that her smoke detector did not have a battery in it when she took it down, she identified a photograph of the smoke detector taken shortly after the [fire] and agreed it had a battery installed.

On redirect examination, the Defendant testified that she did not knowingly start a fire in her apartment. She said that her actions were reckless and that she did not make good decisions that day.

*State v. Washington*, 387 S.W.3d 595, 597-605 (Tenn. Crim. App. 2012).

The Petitioner filed a pro se petition for post-conviction relief alleging multiple grounds for relief. After she received appointed counsel, an amended petition was filed alleging ineffective assistance of trial counsel. Specifically, it alleged counsel did not adequately prepare for the trial, did not object to the playing of a DVD of the Petitioner's police interviews, allowed the Petitioner to testify, did not present the Petitioner's treating physician as a trial witness, and did not request a mistrial when a juror disclosed he had a child who was a "burner."

At the post-conviction hearing, trial counsel testified that she had practiced law for twenty-two years and that in 2010, one-half of her practice was criminal. By May 2010, she had served as lead counsel in more than 100 criminal trials and had represented more than 600 criminal defendants, many of whom had mental illnesses. She was a former board member of the Mental Health Cooperation Foundation and a member of the National Alliance of the Mentally Ill. She believed that during the hearing on the motion for a new trial, she filed a motion to withdraw and suggested to the trial court that the Petitioner could make a claim for ineffective assistance of counsel. She was trained by a group of experienced criminal defense lawyers and said, "[A] good criminal defense attorney will always throw themselves on their sword on behalf of their client."

Trial counsel testified that she came into contact with the Petitioner in February or March 2010. They spoke at least two or three times before the Petitioner retained her on April 27, 2010. Because the Petitioner accused her previous counsel of not speaking with the Petitioner's daughter's counselors, trial counsel first spoke with the counselors.

Trial counsel testified that she knew the trial was set for May 5, 2010, when she accepted the case. She discussed with the Petitioner the risks involved with her taking the case so close to the trial. She told the Petitioner that counsel's entire staff would have to work on the case, that the Petitioner needed to be certain about changing attorneys because counsel did not know if the trial court would grant a continuance, and that adequate preparation would require many hours of work. She said the Petitioner seemed lucid and not manic at the time.

Trial counsel thought she discussed the possibility of a continuance with the State. She prepared a motion requesting a continuance but did not file it because she was discouraged about the likely outcome after having a conversation with the trial judge.

Trial counsel testified that she had eight days to prepare for the trial after she was retained. She had prepared for trials in less time but said eight days was not ideal.

Trial counsel testified that she went to the public defender's office to review previous counsel's files. She spent a considerable amount of time reviewing previous counsel's work and determined that previous counsel had done a "very thorough job."

Trial counsel testified that she learned from the Petitioner's mental health records that the Petitioner had bipolar disorder with psychotic features and likely suffered from the disorder since 1997. She reviewed records showing the Petitioner had blackouts, threatened to commit suicide, ingested lighter fluid, and heard voices telling her to kill herself. She did not read that the Petitioner claimed to hear a CB radio. Because the Petitioner blamed her daughter for the fire, a mental health defense did not seem logical.

Trial counsel testified that even though the Petitioner had a history of hallucinations, counsel did not explore the defense theory that the Petitioner was unaware of what was happening on the day of the fire. She said the theory would have been unsuccessful because the Petitioner claimed she was completely coherent at the time of the fire, signed two written statements, and gave a video-recorded statement. She believed Dr. Zia Wahid, the Petitioner's treating physician, may have reviewed the evidence from the day of the fire. She could not remember if she spoke with Dr. Wahid about the evidence before the trial.

Trial counsel testified that in preparation for the trial, she interviewed at least five or six people, including some of the counselors, and reviewed all of previous counsel's notes relative to the interviews and work product. She was unsure how many witnesses she subpoenaed for the trial but did not dispute six subpoenas were issued. She also was unsure how many witnesses the State subpoenaed.

Trial counsel testified that she reviewed the DVD of the police interviews and that it painted the Petitioner in an unfavorable light. She said the Petitioner confessed to setting the fire. Counsel recalled the Petitioner's admitting to closing the door while the fire burned in the furnace room and to giving statements regarding a prior fire that occurred in Michigan for which the Petitioner received payment from her insurance company. She did not file a motion to suppress the DVD because common practice in Williamson County was to try to reach as many agreements as possible with the State before a trial and because the State agreed to redact portions of the DVD related to the Michigan fire.

Trial counsel testified that she thought the Petitioner's belief that her daughter started the fire was plausible until counsel spoke to some witnesses before the trial. She said the Petitioner insisted on blaming her daughter and encouraged her sister and mother to blame the daughter because the child was a minor.

Trial counsel testified that she did not remember suggesting playing the DVD for the jury. She said the trial court may have suggested it, and the State could have found the court's suggestion objectionable. She never asked the court reporter to transcribe the DVD as it was played. She saw no need for a transcript because she had the DVD and had never seen court reporters transcribe a recording. She and the prosecutor had "notes with the times written" for starting and stopping the DVD, but she did not know if the trial transcript indicated the times.

Trial counsel testified that she did not recall if the Petitioner testified about the medications the Petitioner was taking during the trial, although counsel said it was possible. She did not think the Petitioner was "foggy" on the day of the trial and could not recall if counsel argued the Petitioner's medications could have affected her at the police station. She said that during the trial, the Petitioner seemed coherent in the mornings and then "act[ed] out" after lunch, becoming dramatic, "over-the-top," and inconsistent. The Petitioner also appeared to fall asleep as a result of a "sugar drop," but counsel did not recall her fainting. During a bench conference, the prosecutor commented that the Petitioner was "not with it."

Trial counsel testified that she did not know if the Petitioner was unable to recall events based on her behavior and medication because at times the Petitioner handed counsel copious notes with to-the-point questions. At other times, they "had the drama." Counsel discussed with the Petitioner the risks of testifying and advised against testifying given the Petitioner's performance in the police interviews.

Trial counsel testified that Dr. Wahid was not presented as a trial witness because the Petitioner wanted to assert the defense theory that her daughter set the fire. Dr. Wahid was, however, presented as a witness at the sentencing hearing and testified that the Petitioner had

hallucinations and could have been diagnosed with mental health issues as early as 1997. Counsel said Dr. Wahid was an "excellent" witness.

Trial counsel testified that during jury deliberations, a juror disclosed that his child had set fires. She was in favor of retaining the juror and thought his empathy and knowledge of the issues could benefit the Petitioner. She said it would have been "wonderful if he could hang up the rest of the jury." She did not recall the juror's disclosing that his child was a foster child, that he eventually "gave up" on the child, or that his wife first gave up on the child and told him that the child would be his problem. She also did not recall the juror's disclosing information during voir dire regarding his experiences with fire, his knowledge of arson laws, or his working at Vanderbilt. She did not recall the juror's stating he had to grade papers when the trial court asked if the jurors had any distractions. She did not recall if she had reason to strike the juror during voir dire, but she did not object to his remaining on the jury panel.

Trial counsel testified that even though the Petitioner owed some attorney fees at the time of the trial, this fact did not make counsel wish to have the case over. She reassured the Petitioner that she would continue to represent her and said that attorneys have an obligation to do their work. She said the Petitioner was "a very difficult client."

On cross-examination, trial counsel testified that her law license was in good standing and that none of her previous clients had filed post-conviction petitions. She spent hours reviewing previous counsel's file and the discovery. She devoted two full-time paralegals and one part-time attorney to the case. They spent about 200 hours preparing for the trial.

Trial counsel testified that she reviewed the State's expert witness reports and the Petitioner's written statements, all of which were unfavorable. She was unsuccessful in showing through cross-examination of the experts that a bad furnace in the Petitioner's apartment caused the fire. A defense expert hired by previous counsel also concluded that arson occurred. Counsel believed the Petitioner liked to "huff" lighter fluid fumes.

Trial counsel testified that against her advice, the Petitioner insisted on testifying. She did not recall if the Petitioner always expressed the desire to testify and to defend herself. Previous counsel had the Petitioner undergo a mental health evaluation, and she was found competent. The evaluation did not support an insanity defense. Neither trial counsel nor previous counsel filed a notice of intent to present a mental health defense or relied on such a defense. Trial counsel thought it would have "muddied the waters for the jurors." Counsel said it would have been difficult to assert the defense and then argue the Petitioner's daughter set the fire. The State's experts testified that the fire was intentional, and counsel said it was easier to point fingers at someone else. Counsel said the Petitioner appeared competent in

the police interviews and not to suffer from a mental disease or disorder. Counsel believed that if she had presented a mental disease defense, the defense would have lost credibility with the jury.

Trial counsel testified that the DVD was played during the Petitioner's cross-examination and not the State's case-in-chief. She and the State agreed to redact information about other fires, and she thought the jury never heard about the Michigan fire.

Trial counsel testified that she did not file a motion to suppress the DVD because she had no legal basis to do so. The Petitioner waived her rights before the police interviews, and no evidence showed her waiver was unknowing or coerced.

Trial counsel testified that she felt prepared when the trial began. She successfully prevented certain evidence from being admitted during Whitney Mitchell's testimony and prevented the fire marshall from rendering an expert opinion about the origin of the fire.

Trial counsel testified that the trial court questioned the Petitioner and determined she was competent to testify. She presented as witnesses the Petitioner's daughter, who admitted to starting the fire, and a family member who was a respected doctor who discussed "instances of burning" by the daughter. She said that despite these witnesses, the State's case included the Petitioner's two written statements, her videorecorded statement, and numerous expert witnesses. She said her decision not to request a mistrial or the removal of the previously mentioned juror was a strategic decision.

On redirect examination, trial counsel testified that she did not explore with the Petitioner the effect of inhaling lighter fluid fumes because the Petitioner blamed her daughter for the fire. She did not recall if she explored the possibility that lighter fluid was throughout the Petitioner's apartment because of her habit of huffing lighter fluid fumes or if they discussed whether admitting to huffing would have helped the defense. She said the Petitioner's 2007 mental health evaluation would probably not have been relevant to her mental state in 2010.

Trial counsel testified that her notes indicated where she and the State agreed to mute the DVD before it was played. She said she "probably would have been objecting . . . to [the] top of [her] lungs if they had made a mistake" while it was played.

Previous counsel testified that she was appointed to the Petitioner's case in 2007 and that trial counsel became counsel of record on April 29, 2010. Trial counsel came to previous counsel's office one or two weeks before the trial to obtain the discovery. Previous counsel thought some of her work product was not provided to trial counsel. She discussed

the nature and potential benefits of the experts and their respective reports with trial counsel, but previous counsel could not remember if trial counsel saw the reports or how long trial counsel stayed at her office.

Previous counsel testified that she represented the Petitioner for about three years. She said that she would have had difficulty preparing for a trial in a short period of time but that she did not know trial counsel's qualifications, capabilities, or trial record.

On cross-examination, previous counsel testified that trial counsel was given a copy of the discovery. The Petitioner's mental health evaluation report stated that she was competent and that an insanity defense could not be supported. Previous counsel did not file a notice to present an insanity defense. The post-conviction court noted that previous counsel also did not file a motion to suppress the Petitioner's written or video-recorded statements.

LaRonce Stephens, the court reporter at the trial, testified that she transcribed the Petitioner's testimony. She did not transcribe audio or video recordings presented during trials because they were not "in front of [her]" and because transcriptions were not usually requested. In this case, she neither transcribed the DVD nor received a transcript request from either party.

On cross-examination, Ms. Stephens testified that she did not tell the parties that she would not transcribe the DVD. She did not know if the parties assumed she was going to transcribe the DVD. She did not recall if portions of the DVD were muted. She said muting objectionable portions of recordings was common practice in Williamson County. On redirect examination, she testified that the transcript would have shown if she told the parties that she was not transcribing the DVD.

Dr. Zia Wahid, an expert in the field of psychiatry, testified that he treated the Petitioner from December 2007 to April 2010 and that she could have suffered from her bipolar disorder as early as 1997. He said that if she took her multiple medications three times a day, they could have affected her level of coherence and made her fall asleep, become exhausted, or be "out of it."

Dr. Wahid testified that he did not recall the Petitioner's reporting to him that she had suffered blackouts, although a medical record entry showed she reported blackouts and seizures. He did not recall if she threatened to commit suicide but recalled she reported several hallucinations. Given her condition, he concluded that she may have had difficulty with recall, but he could not say without reviewing the evidence if she had trouble at the time of the fire. They did not discuss the fire during the time he treated her.

Dr. Wahid testified that he did not recall the Petitioner's handing him a subpoena for the trial or trial counsel's telling him that he was needed at the trial. He said a patient deemed competent in 2007 might be incompetent in 2010.

On cross-examination, Dr. Wahid testified that he did not know the Petitioner underwent a competency evaluation in 2007. He knew, however, that she was evaluated in 2008 but did not know the outcome. He also did not observe her in the courtroom during the trial or on the DVD.

Dr. Wahid testified that toward the end of 2009 and the beginning of 2010, the Petitioner told him that her daughter might have started the fire. The Petitioner never discussed with him whether she would testify at the trial.

The Petitioner testified that she first contacted trial counsel by email to request representation. Counsel responded that she needed time and money to prepare for the trial. The Petitioner became sick and did not contact counsel for at least one year until late April 2010. She denied they spoke two or three times before she hired counsel.

The Petitioner testified that she changed attorneys close to the trial because she believed a retained attorney would provide better representation than a public defender. She also believed she would receive a continuance. Trial counsel did not discuss with the Petitioner the risks of changing attorneys close to the trial, provide written documentation regarding the risks, or inform her that counsel might not have access to previous counsel's entire file. Counsel told the Petitioner that counsel would obtain information about the case, a continuance, and a plea agreement. The Petitioner said that had she known counsel could not secure a continuance or a plea agreement, she would not have hired counsel one week before the trial.

The Petitioner testified that as a result of her mental disorder, she became uncontrollable and sometimes suffered blackouts, found herself talking out loud, heard voices or things in her head, had unpredictable mood swings, and had moments where she had "so much going on in [her] head" that she needed to sit silently by herself. She reported to Dr. Wahid her blackouts, seizures, and hearing a CB radio.

The Petitioner testified that her mental health at the beginning of 2010 was "shaky" and that she had been hospitalized for three weeks for a nervous breakdown. Her mental health in 2010 differed from 2007 in terms of her memory, emotional control, and behavior. She hallucinated and tried to hurt herself a few times. In early 2010, she recovered from MRSA. Trial counsel told the Petitioner that although her physical and mental health were

important, counsel wanted to avoid introducing such evidence to the jury because the jury might perceive the Petitioner as having a "pity party."

The Petitioner testified that she did not believe trial counsel had adequate time to prepare for the trial and that with more time, counsel would have built a stronger defense. Regarding the DVD, counsel told the Petitioner that she seemed to be "un-at-ease" during the police interview and not in the "right state of mind" when she hugged the fire marshall. The Petitioner believed that the DVD was damaging to the case and that it did not describe accurately what occurred on the day of the fire because the police "heard what they wanted to hear, but not exactly what [she] was trying to tell them." She said that she felt coerced and that everything was "blown out of proportion." Counsel told the Petitioner that counsel had reviewed the DVD, thought it was incriminating, and would object to its admission.

The Petitioner testified that trial counsel asked her to testify, did not inform her of the risks, and told her that cross-examination would not be "so bad." Counsel did not inform the Petitioner that her testimony might open the door to the State's presenting the DVD as evidence. Counsel stated that she would file a motion to suppress the DVD. The Petitioner said counsel advised her to testify because counsel knew that "it was going to come out in the best interest for [the Petitioner] to tell them exactly what happened in [her] own words."

The Petitioner testified that she took numerous medications and fainted at one point during the trial. She did not feel she was in a good condition to testify and thought that had trial counsel advised her of the risks of testifying, she would not have been convicted and sentenced to eighteen years.

The Petitioner testified that trial counsel told her the only reason Dr. Wahid was not called as a trial witness was because "we didn't pay for him to come." Counsel never approached the Petitioner regarding Dr. Wahid's fee. The Petitioner believed that if Dr. Wahid's testimony had been presented at the trial, she would have been acquitted or received a reduced sentence.

The Petitioner testified that trial counsel did not request a mistrial after the juror's disclosure because counsel thought he would have been helpful to the Petitioner's case. She believed that if she had been granted a mistrial, she would have had the opportunity to present her case to a bias-free jury and that if counsel had been effective, the Petitioner would not have been serving her sentence.

On cross-examination, the Petitioner testified that during the trial, she identified to the trial court the numerous medications she took three times a day. She said, however, she understood that she was testifying and that the State would question her. She said she was

not "fuzzy" when she testified. After she had stated her medications' side effects, she told the trial court that she knew what she was doing, and the court found her competent to testify.

The Petitioner testified that she did not tell the trial court she needed a continuance because she did not have the right to make the statement. Trial counsel told the Petitioner that counsel requested but was denied a continuance.

The Petitioner testified that she met previous counsel numerous times during previous counsel's representation. The Petitioner then decided to hire another attorney just before the trial. According to a letter she wrote previous counsel, previous counsel did not comply with the Petitioner's request for previous counsel to interview the counselors or the Petitioner's daughter until a few weeks before the trial. Trial counsel interviewed all of the witnesses and presented the Petitioner's daughter as a witness. The Petitioner did not insist on the defense theory of blaming her daughter for the fire and never said her daughter was responsible for the fire. She also did not tell counsel whom to contact regarding her daughter's experiences with fire and did not speak with other family members regarding the matter.

The Petitioner testified that she admitted in her written statements that she lit a match to smoke a cigarette, that she flicked the match after it was out, and that the match landed on a towel. She could not remember if she saw the towel burn or if she became angry and left her apartment. She was evaluated at least once to determine if she was competent and if an insanity defense was possible. She did not remember being evaluated in 2009.

The Petitioner testified that she did not know if previous counsel took action to exclude the DVD from evidence. She was advised of her *Miranda* rights, signed a waiver form, and agreed to speak to the police officers. She said, however, that she did not understand the meaning of her *Miranda* rights. She could read and had associate's degrees in nursing and applied sciences.

The Petitioner testified that even if she had been represented by a different attorney, the physical evidence against her would have remained the same. She said her defense theory was not to blame her daughter for the fire. She was high, blacked out, and was "fuzzy" on the morning of the fire, all of which she reported to her attorneys. She did not remember being lucid during the police interviews.

The Petitioner testified that the decision to testify was not hers, that she had not always wanted to testify, and that she did not insist on testifying. On redirect examination, she testified that she told trial counsel that she huffed lighter fluid fumes and was high the morning of the fire but that counsel did not bring out those details in the Petitioner's testimony.

Fire Marshall Andy King testified that he participated in the police interviews and was present when the Petitioner waived her rights. He said she gave no indication she did not understand the waiver form or was impaired. On cross-examination, he testified that he was not an addiction or mental illness expert.

The post-conviction court denied the Petitioner relief. The court credited the testimony of trial counsel and previous counsel. Regarding the Petitioner's claim that trial counsel did not prepare adequately for the trial, the court found that counsel had practiced criminal defense law for twenty-two years and had served as lead counsel in more than 100 criminal trials. Although counsel was retained shortly before the trial, she and the Petitioner had met several months previously. After being retained, counsel, two full-time paralegals, and a part-time attorney devoted themselves to the case and spent about 200 hours preparing for the trial.

The post-conviction court found that previous counsel prepared the case for trial and had the Petitioner evaluated to determine her competency and if an insanity or diminished capacity defense was possible. Based on the report, previous counsel did not file an insanity defense notice. Trial counsel also chose not to advance a mental health defense based on the mental health records.

The post-conviction court found that trial counsel reviewed previous counsel's file, the discovery, and the expert reports requested by previous counsel. Because the reports were unfavorable to the Petitioner, trial counsel did not pursue a defense expert. Previous counsel also did not plan to have a defense expert testify because she did not file an expert witness notice.

The post-conviction court found that both attorneys reviewed the DVD and decided not to file a motion to suppress. Trial counsel determined a motion to suppress would have been unsuccessful.

The post-conviction court found that the Petitioner insisted on the defense theory that her daughter set the fire. After examining the discovery and the Petitioner's mental health records, trial counsel made the strategic decision to pursue the theory.

The post-conviction court found that during the trial, trial counsel successfully prevented Fire Marshall King from being accepted as an expert witness and successfully prevented admission of Ms. Mitchell's documentation. The court found that counsel's trial investigation, preparation, and strategy were not unreasonable and that the Petitioner failed to show counsel's performance resulted in prejudice.

Regarding the Petitioner's claim that trial counsel should have objected to the admissibility of the DVD, the post-conviction court found that an agreement to mute objectionable portions of recordings was common practice in Williamson County and did not fall below the standard of reasonableness. The court found that the DVD was properly admitted into evidence. The Petitioner gave knowing and voluntary statements after waiving her rights, freely gave her statements, and did not appear to suffer from a mental disease. The court found that counsel's decision not to file a motion to suppress was reasonable.

The post-conviction court found that the Petitioner's statements in the DVD were presented at the trial through the testimony of Detective Kevin Adams and Fire Marshall King and her written statements. The court also found that she failed to show prejudice.

Regarding the Petitioner's claim that trial counsel should have presented Dr. Wahid as a trial witness, the post-conviction court found that the Petitioner was determined to be competent, that the proof would not support an insanity or a diminished capacity defense, and that the Petitioner's demeanor in the DVD did not support a viable mental health defense strategy. The court found that the Petitioner wanted to pursue a strategy involving her daughter and that introducing the Petitioner's mental health would have "derailed" this theory.

The post-conviction court found that Dr. Wahid's testimony at the sentencing and post-conviction hearings was not compelling and that he would not have been an effective trial witness. Nothing in his testimony indicated the Petitioner's bipolar disorder mitigated the elements of aggravated arson. The court found that she failed to show prejudice.

The post-conviction court found that the Petitioner had the presence of mind to increase her renter's insurance policy days before the fire, to report the fire to her insurance company, and to file and later withdraw an insurance claim. The court found that she also knew to use an accelerant and to remove a smoke alarm. The court found that based on her demeanor and statements during the first police interview and her ability to write her statements, no clear and convincing evidence existed showing her mental health could have been a basis for relief. Additionally, the Michigan fire could have become relevant had the Petitioner raised a mental health defense. The court found that trial counsel's decision not to introduce such a defense was reasonable.

Regarding the Petitioner's claim that trial counsel should have requested a mistrial after the juror's disclosure, the post-conviction court found that counsel made a reasonable tactical decision that could have helped the Petitioner. The court found that someone who had a child who was a burner would have reasonably tended to believe the Petitioner's

daughter could have started the fire. Additionally, the trial court interviewed the juror and determined his presence on the jury would not improperly prejudice the Petitioner.

Regarding the Petitioner's claim that trial counsel subjected her to a rigorous cross-examination and opened the door for admission of the DVD by having her testify, the post-conviction court found that the Petitioner insisted on testifying against counsel's advice and that counsel had no choice but to allow the Petitioner to testify. Although the Petitioner claimed she was in no condition to testify, the trial court questioned her before she testified and determined she was competent.

In this appeal, the Petitioner contends that the post-conviction court erred by denying her relief. She argues trial counsel was ineffective by not preparing adequately for the trial, failing to object to the admission of the DVD, subjecting the Petitioner to a rigorous cross-examination and opening the door for admission of the DVD by having her testify, not presenting Dr. Wahid as a trial witness, and not requesting a mistrial after the juror's disclosure.

Post-conviction relief is available "when the conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103 (2012). A petitioner has the burden of proving his factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f) (2012). A post-conviction court's findings of fact are binding on appeal, and this court must defer to them "unless the evidence in the record preponderates against those findings." *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *see Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's application of law to its factual findings is subject to a de novo standard of review without a presumption of correctness. *Fields*, 40 S.W.3d at 457-58.

To establish a post-conviction claim of the ineffective assistance of counsel in violation of the Sixth Amendment, a petitioner has the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). The Tennessee Supreme Court has applied the *Strickland* standard to an accused's right to counsel under article I, section 9 of the Tennessee Constitution. *See State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner must satisfy both prongs of the *Strickland* test in order to prevail in an ineffective assistance of counsel claim. *Henley*, 960 S.W.2d at 580. "[F]ailure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). To establish the

performance prong, a petitioner must show that "the advice given, or the services rendered . . . , are [not] within the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975); *see Strickland*, 466 U.S. at 690. The post-conviction court must determine if these acts or omissions, viewed in light of all of the circumstances, fell "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. A petitioner "is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision." *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); *Pylant v. State*, 263 S.W.3d 854, 874 (Tenn. 2008). This deference, however, only applies "if the choices are informed . . . based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). To establish the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

## I. Adequacy of Trial Counsel's Preparation

Regarding trial counsel's preparation, counsel's credited testimony reflects that the Petitioner contacted counsel two or three months before the trial and that they spoke several times before the Petitioner retained her on April 27, 2010. Counsel knew the trial was scheduled for May 5, 2010, and advised the Petitioner of the risks in changing attorneys close to the trial. She told the Petitioner that the Petitioner needed to be certain about changing attorneys because counsel could not guarantee the trial court would grant a continuance.

Trial counsel had eight days to prepare for the trial. Although she testified that eight days was not ideal, she had prepared for trials in less time. Upon being retained, she interviewed five or six potential witnesses, including the Petitioner's daughter's counselors. She also reviewed previous counsel's file, work product, and notes, the discovery, the expert reports, the Petitioner's written statements, the DVD, and the defense expert's conclusions. She concluded that previous counsel had prepared well for the trial. Although previous counsel said that some of her work product was not provided to trial counsel and that they discussed the nature and potential benefits of the experts and their reports, trial counsel knew the evidence was unfavorable to the Petitioner. Counsel, two full-time paralegals, and one part-time attorney spent about 200 hours preparing for the trial.

Trial counsel learned of the Petitioner's mental health disorder and symptoms and knew the Petitioner could have been diagnosed in 1997. Counsel made a strategic decision not to present a mental health defense because the Petitioner insisted on blaming her daughter for the fire. Counsel was concerned about losing credibility with the jury because the DVD

did not show any evidence of mental health issues. The results of the Petitioner's 2007 evaluation showed she was not incompetent or insane. Additionally, counsel did not pursue the theory that the Petitioner was not aware of her surroundings on the day of the fire or that she was high from huffing lighter fluid fumes because the Petitioner said she was coherent, blamed her daughter for the fire, signed two written statements, and made a video-recorded statement.

Trial counsel focused on the defense that the Petitioner's daughter started the fire. As requested by the Petitioner, counsel interviewed the Petitioner's daughter and the counselors. Counsel presented as trial witnesses the Petitioner's daughter, who admitted to starting the fire, and another family member, who discussed the daughter's burning incidents. The Petitioner testified that she may have been reckless but did not knowingly start the fire. Counsel also successfully prevented Fire Marshall King from rendering an expert opinion and prevented the State from introducing Ms. Mitchell's documentation.

While trial counsel admitted she filed a motion to withdraw and suggested to the trial court that an ineffective assistance of counsel claim could have been filed against her, she explained that "a good criminal defense attorney will always throw themselves on their sword on behalf of their client." She also testified that the Petitioner's late attorney's fee payments had no effect on her representation. The evidence does not preponderate against the post-conviction court's findings that counsel did not provide deficient performance. *See Henley*, 960 S.W.2d at 578.

Regarding the Petitioner's remaining issues, we note she admits all of trial counsel's related decisions were tactical in nature. Because counsel's preparation was adequate, her tactical decisions deserve deference.

## II. Failure to Object to the DVD

Regarding whether trial counsel should have objected to the DVD, the record reflects that she reviewed the DVD and concluded it was unfavorable to the Petitioner based on her incriminating statements. Counsel did not file a motion to suppress the DVD because she had no legal basis for a motion. The Petitioner was advised of her rights and waived them before giving any statements, and no evidence showed her waiver was involuntary, unknowing, or coerced. Although the Petitioner said she did not understand the meaning of her *Miranda* rights, Fire Marshall King testified that nothing indicated she did not understand the waiver form or was impaired. We note the Petitioner had two associate's degrees and could read. Counsel also did not file a motion to suppress the DVD because she and the prosecutor agreed to redact the portions related to the Michigan fire. She and the prosecutor

noted the times when the DVD was to be muted, and common practice in Williamson County was to mute the objectionable portions.

The DVD was introduced during the Petitioner's cross-examination. While nothing in the transcript shows which portions the jury heard, it remained unaware of the Michigan fire. The record does not preponderate against the post-conviction court's findings regarding the admission of the DVD, and this court "will not second-guess trial counsel's informed tactical strategic decisions." *Pylant*, 263 S.W.3d at 874; *see Adkins*, 911 S.W.2d at 347. Thus, trial counsel's performance was not deficient on this basis.

### III. Testimony by the Petitioner

Regarding whether trial counsel subjected the Petitioner to a rigorous cross-examination and opened the door for admission of the DVD by having her testify, the record reflects that the Petitioner did not think she was in a good condition to testify. The trial court, however, questioned the Petitioner and determined she was competent to testify. The Petitioner informed the court of her medications and the side effects but agreed that she knew what she was doing and that she understood she would be questioned by the State. Her 2007 evaluation also showed she was competent for trial.

The post-conviction court credited trial counsel's testimony that she advised the Petitioner of the risks of testifying and advised her against testifying; however, the Petitioner insisted on testifying. Because "the right to testify at one's own trial is a fundamental right," only the Petitioner could waive this right. *Momon v. State*, 18 S.W.3d 152, 161 (Tenn. 1999). Thus, counsel was not deficient on this basis.

### IV. Absence of Dr. Wahid as a Trial Witness

Regarding whether trial counsel should have presented Dr. Wahid as a trial witness, the record reflects that if he had testified, he would have stated that he treated the Petitioner from 2007 to 2010, that she could have suffered from a mental health disorder since 1997, that she reported having hallucinations, and that she told him in 2009 or 2010 that her daughter could have started the fire. He could not testify, however, as to the Petitioner's mental condition at the time of the fire.

Regardless of Dr. Wahid's value as a trial witness, trial counsel testified that she did not subpoena him because the Petitioner wanted to blame her daughter for the fire. The Petitioner testified that the only reason given to her by trial counsel as to why Dr. Wahid was not called as a witness was because the Petitioner did not pay him; however, the post-conviction court credited counsel's testimony. The record does not preponderate against the

post-conviction court's finding that Dr. Wahid's testimony would not have assisted the defense because counsel pursued a trial strategy involving the Petitioner's daughter. This court "will not second-guess trial counsel's informed tactical strategic decisions." *Pylant*, 263 S.W.3d at 874; *see Adkins*, 911 S.W.2d at 347. Thus, counsel was not deficient on this basis.

## V. Failure to Object to a Juror

Regarding whether trial counsel should have requested a mistrial after the juror's disclosure that his foster child started fires, the record reflects that counsel was in favor of the juror remaining on the jury panel. She thought he might understand the Petitioner's issues, empathize with her situation, and possibly affect the verdict to the Petitioner's benefit. The record does not preponderate against the post-conviction court's findings, and this court "will not second-guess trial counsel's informed tactical strategic decisions." *Pylant*, 263 S.W.3d at 874; *see Adkins*, 911 S.W.2d at 347.

We note the overwhelming evidence of the Petitioner's guilt. The evidence showed that the fire was started purposefully, that the Petitioner increased her renter's insurance coverage only days before the fire, and that she made inconsistent and incriminating statements to the police. At the post-conviction hearing, she testified that she admitted in her police statements that she lit a match to smoke a cigarette, that she flicked the match after it was out, and that the match landed on a towel. As a result, we conclude that the Petitioner is not entitled to relief.

Based on the foregoing and the record as a whole, we affirm the judgment of the post-conviction court.

_____
ROBERT H. MONTGOMERY, JR., JUDGE

-28-